Filed 4/20/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| RUEGG & ELLSWORTH et al., <br>     Petitioners and Appellants, <br> v. <br> CITY OF BERKELEY et al., <br>     Defendants and Respondents, <br><br> CONFEDERATED VILLAGES OF LISJAN et al., <br>     Interveners and Respondents. | A159218 <br><br> (Alameda County Super. Ct. No. RG18930003) |

Ruegg & Ellsworth and Frank Spenger Company applied to the City of Berkeley (City) for approval of a mixed-use development pursuant to Government Code section 65913.4, which provides for streamlined, ministerial approval of affordable housing projects meeting specified requirements and conditions. The City denied the application for failure to meet several statutory requirements. Appellants now appeal the trial court's denial of the petition for writ of mandate by which they sought to require the City to grant their application. For the reasons explained herein, we will reverse the judgment and remand with directions for the trial court to grant the writ petition.

1

## BACKGROUND

In 2015, appellants submitted an application for a mixed-use development at 1900 4th Street (Spenger's parking lot) in Berkeley with 135 apartments over approximately 33,000 square feet of retail space and parking.  The project site is the block bordered by Hearst Avenue on the north, University Avenue on the south, Fourth Street on the east, and the Union Pacific Railroad tracks (Third Street) on the west.

The development site is part of a three-block area the Berkeley Landmarks Preservation Commission (Commission) designated a City of Berkeley Landmark in 2000, as the location of the West Berkeley Shellmound (CA-ALA-307) (Shellmound).[1]  The Shellmound is listed in the California Register of Historical Resources.

As described in the City's landmark application, the Shellmound "is believed to have been one of the first of its kind at the Bay's edge, built ca 3,700 B.C.," 1,000 years before the first pyramid.[2]  Shellmounds were "sacred burial sites for the average deceased mound-dweller," slowly constructed over thousands of years from daily debris and artifacts left by the tribelet communities that lived on the site.  "The importance of the shellmounds should not be underestimated."  Shellmounds contained "ritual burials exhibiting a variety of deliberate, traditional positioning and use of burial goods" and "[e]ven to this day, native descendants value these mounds as

---

[1] The landmark area extends north to south from Hearst Avenue to University Avenue and east to west from 4th Street to I-880.

[2] A 2017 letter from a University of California Berkeley professor of Anthropology states that the Shellmound is the earliest known shellmound site in the region, first occupied about 4,900 years ago and used for the next 3,700 years, and sporadically revisited after that.  It is #307 of "no less than four hundred and twenty-five shellmounds on or near the shoreline of the Bay" recorded by Archaeologist N.C. Nelson in 1907 and 1908.

sacred resting sites of their early ancestors." In 1950, a University of California Berkeley archeologists removed "numerous artifacts and 95 human burials" from the Shellmound. Other findings from the Shellmound include a section of the floor of a "large, presumably ceremonial house," firepits, burials revealing ceremonial red paint and "mortuary goods," animal burials, food debris, and artifacts providing information about diet and means of food collection, shell beads, and stone and bone tools.

The decision approving the West Berkeley Shellmound as a City landmark states that the Shellmound "is most highly significant to native descendants as a sacred burial ground," its "cultural resource lies in its age, the fact that it is the oldest and one of the largest mounds established around the bay, that it represents ancient culture, that it was built by the earliest humans in the area," that "it is recognized that this historical resource has yielded and is likely to yield information 'important in prehistory or history,'" and that "the Shellmound plays an important role in the history of the changing shoreline and the change in attitude towards the use of natural resources." The landmark designation does not include any above ground buildings or structures; it included "the site itself and all items found subsurface including artifacts from the earliest native habitation, such as but not limited to native tools, ornaments, and human burials."

Nothing remains of the Shellmound above ground. As described in a November 2016 Draft Environmental Impact Report (DEIR) prepared for the Berkeley Planning and Development Department (Department) in connection with appellants' 2015 application, by the mid-20th century, "most of the Shellmound had been systematically demolished by development and related ground disturbance. Shellmound materials were scattered throughout the surrounding area as agricultural fertilizer and for road-building and paving."

3

A 1950 survey reported that the "original dimensions and exact limits of the Shellmound could not be determined because most of it had been removed," but it "seems to have covered an elliptical area, conservatively estimated at 350 x 600 feet, with its long axis paralleling Strawberry Creek." The portion remaining in 1950 measured 45 by 100 feet. Its highest point was 15 feet above ground, but it had been higher, as "the peak had been cut down and leveled to serve as the base for a water tank," and it extended three feet below ground.

One of the questions in this case is whether the Shellmound was actually located on the project site. According to the historical reviews documented in the administrative record, a 1949 survey placed the Shellmound between Hearst and University and between Second and Fourth Streets. A report prepared for appellants in January 2017, by Geosphere Consultants, Inc., contains several historical maps of the area, including an 1856 United States Coast and Geodetic Survey map showing one shellmound to the east of the project site and one to the west of the site; the same is true on a 1957 United States Geological Survey map. Based on these and other maps, as well as exploratory borings, the report concluded the shellmounds were in "close proximity to" but did not "encroach onto the project site."

Graphics and video consultants for interveners Confederated Villages of Lisjan (CVL), using the 1856 and 1957 maps and a 2018 "OpenStreetMap," created a series of maps that show the shellmound to the west of the project site "mostly within the block west of the Project site" but extending into the northwest corner of the project site.

A map from a 1907 manuscript shows the Shellmound on much of the project site and extending to the east of Fourth Street.

As related in a 2002 "Cultural Resources Inventory" prepared for the City by Garcia and Associates (lead author Christopher Dore), in 1999 Allen Pastron of Archeo-Tec placed and evaluated borings within the northeastern quadrant of the Spenger's parking lot, near the intersection of Fourth Street and Hearst Avenue, and found "no evidence to suggest that remnants of the West Berkeley Shellmound exist" in that area. Pastron conducted additional testing in 2000, and found two "culturally sensitive areas" containing "prehistoric deposits" of silt or silty clay "interspersed with flecks of charcoal, a relatively small quantity of fish and mammal bone, a few pieces of fire-affected rock, several possible stone artifacts and ubiquitous amounts of shell," one in the northwestern quadrant of the parking lot at depths of five to nine feet, and the other in the east-central portion of the site at depths of six to nine feet. Pastron opined that material from the six- to eight-foot layer of Boring #19, in the northwest quadrant, "probably represents a remnant of CA-ALA-307," although there were no tools, prehistoric artifacts, or "other signs found that this is assuredly part of CA-ALA-307." Pastron concluded the data was insufficient to determine whether the "areas of prehistoric cultural sensitivity represent zones of primary or secondary archeological deposition." He stated, however, that because it appeared "certain that the heart of the West Berkeley Shellmound (CA-ALA-307) was situated directly to the west of the present project area, across the Union Pacific Railroad tracks" and "the site's original horizontal boundaries were quite extensive, but never precisely determined . . . it is possible that the recently identified cultural deposit may represent an undisturbed, or at least minimally disturbed, remnant of the eastern edge of the West Berkeley Shellmound (CA-ALA-307)."

In 2001, a geoarchaeological investigation conducted in connection with the Cultural Resources Inventory found intact primary deposits of shellmound material in several locations adjacent to the project site on Fourth Street, University Avenue, and Hearst Avenue. The report noted, with reference to Pastron's findings, that "the cultural levels in the parking lot are more deeply buried than the shell levels on 4th Street."

In 2014, Archeo-Tec conducted another investigation of the Spenger's parking lot site, again overseen by Pastron, in consultation with Andrew Galvan, a Native American resource consultant and member of the Ohlone Tribe. The investigation included excavation of 20 trenches in the central portion of the project site and two larger ones in the northwest portion, placed to "extensively sample" areas identified in the 2000 excavation as "potentially containing shellmound material," and use of ground-penetrating radar to pinpoint the "most likely areas of potentially intact midden." Archeo-Tec did not find "intact shellmound" or "primary shellmound deposits" anywhere within the project site, and the "culturally derived deposits" recovered appeared to be "redeposited," "not in primary context." The report explained that test trenches 21 and 22 were opened to "overlap the area previously penetrated by Boring #19 (see Pastron 2000), which indicated a high potential of finding intact shellmound deposits." No artifacts were recovered from trench 21. The investigators stated that, "[u]pon closer examination," they determined Boring #19 "probably did not originally contain intact shellmound between 5 and 9 feet below surface level" because they "only encountered a thin layer of crushed shell," which they believed was "most likely a redistributed remnant of the West Berkeley Shellmound (for the purposes of road building and agricultural soil improvement, described elsewhere) and not the intact shellmound itself." In trench 22, the

6

investigators found "a historic period bottle embedded in the shellmound material, which suggests that the material was redeposited relatively recently and is thus not in original context."

The 2014 data led the investigators to conclude that Shellmound materials identified within the parking lot during testing in 1999 and 2000, were in "secondary deposition," having "probably originated from the West Berkeley Shellmound" but "moved from their original location onto the project site as a consequence of natural creek deposition or in the late 19th or early 20th century during one of many episodes of human-induced topographic modification."  The investigators stated, "we think it is not possible that the culturally derived deposits we encountered were undisturbed remnants of the eastern edge of the West Berkeley Shellmound. Indeed, based on available evidence . . . it is most parsimonious to interpret the shellmound deposits encountered as highly disturbed, secondarily emplaced and probably intentionally distributed, for purposes of road building and agricultural soil enhancement."

The 2014 report acknowledges it could not "eliminate with absolute certainty the possibility that significant historic and pre-contact cultural materials exist within the footprint of the Spenger's Parking Lot site" but the investigators were "confident . . . that this possibility is quite low."  Still, "[i]n consideration of the known long occupation of the area by the Ohlone people and others before them, and in accordance with the known proximity of one of the most important precontact shellmounds in the state of California (i.e., the West Berkeley Shellmound)," the investigators recommended monitoring of "all project related ground disturbance below the historic fill layer (which we find in the Spenger's Parking Lot in excess of approximately 4 feet below the present ground surface)" by a qualified archaeologist and a representative of

the Ohlone people, and a site-wide ground-penetrating radar (GPR) survey prior to full-scale ground-disturbance and demolition."

The DEIR, after review of these and other investigations, stated that although "National Register or California Register-eligible shellmound deposits" had not been identified on the project site in previous excavations, "the possibility exists that intact shellmound deposits could be present in areas that have not been previously excavated" and "excavation could potentially unearth previously unidentified intact shellmound deposits that contribute to the resource's significance under the National Register and California Register. These impacts would have a substantial adverse change on a historical resource due to the destruction of those critical aspects of integrity that qualify it as a City Landmark and for listing in the National Register and California Register." The DEIR concluded that without mitigation measures, the project would have significant impacts including "[a]dverse changes in the significance of a historical resource, the West Berkeley Shellmound (City Landmark #227) during ground disturbing activities." The mitigation measures, which the DEIR stated would reduce the impacts to "a less-than-significant level," included an archaeological survey with ground-penetrating radar to identify areas most likely to yield shellmound material; cultural awareness and sensitivity training for construction contractors prior to ground disturbance; archaeologist review of utility plan prior to issuance of demolition or grading permits to assess potential impacts of, and mitigation measures for, utility excavations; and monitoring of all ground-disturbing activities by an archaeologist and a representative of an Ohlone Tribe.

Galvan, as president of the Board of Directors of Ohlone Indian Tribe, Inc., commented that the DEIR was "accurate with respect to the

8

archeological rigor and methodology" to which the site had been subjected and asked that the mitigations be "vigorously enforced throughout earth working activities." The Commission, however, based on "extensive public testimony" and review of written testimony and documentation, commented that the DEIR was "seriously deficient," particularly with respect to cultural resources.

On April 5, 2018, appellants asked the City to suspend processing of the use permit and California Environmental Quality Act (CEQA) documentation for the project effective March 8, 2018.

Meanwhile, the Legislature enacted Senate Bill No. 35 (Senate Bill 35), effective January 1, 2018, adding section 65913.4 to the Government Code.[3] (Stats. 2017, ch. 366, § 3.) Section 65913.4 requires a "ministerial approval process" for certain affordable housing projects when a locality has failed to provide its share of "regional housing needs, by income category." (§ 65913.4, subd. (a)(4)(A).)[4]

Section 65913.4, subdivision (a), provides that if a proposed development satisfies all of the "objective planning standards" enumerated in the statute, it is subject to a "streamlined, ministerial approval process" and "not subject to a conditional use permit." Among the objective planning standards, as relevant here, and as worded at the time of appellants'

---

[3] Further statutory references will be to the Government Code unless otherwise specified.

[4] The Housing Element Law (§ 65580 et seq.) establishes a system by which the state's need for housing is determined on a regional basis, with a share allocated to each locality in the region and the locality responsible for developing a plan to provide its share of the regional housing needs assessment (RHNA). (§§ 65584.01, 65584.05, 65583, subd. (c), 65583.2, 65588.)

9

application,[5] the development must be "a multifamily housing development that contains two or more residential units" (§ 65913.4, subd. (a)(1)); the development must be "located on a site that satisfies all of the following: [¶] . . . [¶] (C) A site that is zoned for residential use or residential mixed-use development, or has a general plan designation that allows residential use or a mix of residential and nonresidential uses, with at least two-thirds of the square footage of the development designated for residential use" (§ 65913.4, subd. (a)(2)(C));[6] and the development must be "consistent with objective zoning standards, objective subdivision standards, and objective design review standards in effect at the time that the development is submitted to the local government pursuant to this section" (§ 65913.4, subd. (a)(5)). Additionally, the development must *not* be located on a site where any of the following apply:  "The development would require the demolition of a historic structure that was placed on a national, state, or local historic register." (§ 65913.4, subd. (a)(7)(C).)

If the local government determines that a development submitted pursuant to section 65913.4 is "in conflict with any of the objective planning standards specified in subdivision (a), it shall provide the development proponent written documentation of which standard or standards the

---

[5] Section 65913.4 has been amended a number of times.  This opinion will refer to the statute in effect at the time of appellants' application and point out relevant subsequent changes as necessary.

[6] An amendment to section 65913.4 in 2020, among other things, changed the relevant language of subdivision (a)(2)(C), as indicated in italics: "The *development and the site on which it is located satisfy all of the following*: . . .  (C)  It is zoned for residential use or residential mixed-use development, or has a general plan designation that allows residential use or a mix of residential and nonresidential uses, *and at least two-thirds of the square footage of the development is designated for residential use*."  (Stats. 2020, ch. 194, § 1, italics added.)

development conflicts with, and an explanation for the reason or reasons the development conflicts with that standard or standards," within 60 days for a development of up to 150 housing units or within 90 days for a development containing more than 150 housing units. (§ 65913.4, former subd. (b)(1), now subd (c)(1).) "If the local government fails to provide the required documentation pursuant to paragraph (1), the development shall be deemed to satisfy the objective planning standards specified in subdivision (a)." (§ 65913.4, former subd. (b)(2), now subd. (c)(2).)

On March 8, 2018, appellants submitted an application pursuant to section 65913.4 for development at the 1900 4th Street site of 260 dwelling units, 50 percent of which would be "affordable to low-income households," over approximately 27,500 square feet of retail space and parking.

In May 2018, an attorney representing CVL informed the City of his client's intent to sue if the City found the project was subject to ministerial approval under section 65913.4.

On June 5, 2018, the Department provided appellants the written response required by section 65913.4, subdivision (b)(2) ("90-day letter" or "June 2018 letter"), stating that Senate Bill 35 does not apply to the project "to the extent it impinges on legitimate municipal affairs (preservation of a designated City landmark) but nevertheless detailing the Department's analysis of the statutory objective standards. The Department determined that several components of the application were inconsistent with the criteria for streamlined approval and that further information was needed as to others. As relevant here, the Department stated that the project conflicted with the City's Affordable Housing Mitigation Fee (AHMF) requirements and Landmarks Preservation Ordinance (§ 65913.4, subd. (a)(5)); that if the Shellmound or another historic structure was beneath the site, the project

11

could require demolition of a historic structure that was placed on a historic register (§ 65913.4, subd. (a)(7)(C)); and that the project potentially conflicted with the City's requirements that a project meet applicable performance standards for off-site impacts and not exceed amount and intensity of use that can be served by available traffic capacity (§ 65913.4, subd. (a)(5)).

After appellants responded to each of the City's points, the Department denied the application for ministerial approval. Its September 4, 2018 letter first explained that Senate Bill 35 could not constitutionally be applied to the project because of the City's right, as a charter city, to govern itself with regard to municipal affairs, including protection of local landmarks. Second, the letter explained that if Senate Bill 35 applied, the project did not satisfy the requirements for ministerial approval due to conflict with the City's AHMF requirements with respect to very low-income units, conflict with the City's requirements regarding traffic impacts, and fact that the project might require demolition of historic structure that has been placed on a state and local historic register. The Department stated that appellants' original application had been placed on hold and they were welcome to reactivate that project or reapply under a standard use permit for the revised project.

On November 28, 2018, appellants filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the City and the Department. Appellants sought orders declaring Senate Bill 35 constitutional as to the project and requiring the City to issue the ministerial permit for which they applied, alleging that denial of the permit violated both section 65913.4 and the Housing Accountability Act (HAA) (Gov. Code, § 65589.5). The petition challenged respondents' assertion that Senate Bill 35 unconstitutionally impinged on the City's authority over municipal affairs, argued the AHMF and traffic requirements were not objective

12

standards under Senate Bill 35, and argued the Shellmound was not a "structure" within the meaning of the statute and was not located on the project site. Appellants filed a supplemental petition and complaint on December 17, 2018, in order to bring before the court guidelines for the streamlined ministerial approval process issued on November 29, 2018, by the California Department of Housing and Community Development (DHCD Guidelines).

On February 4, 2019, the trial court granted CVL leave to intervene.[7]

Opposing the petition, the City argued the state could not interfere with its authority over municipal affairs under the Home Rule doctrine; Senate Bill 35 did not preempt the City's historic protection authority; appellants failed to demonstrate the City acted arbitrarily, capriciously, and without any evidence in determining appellants did not establish the project would not require " 'demolition of a historic structure' placed on a historic register' " (§ 65913.4, subd. (a)(7)(C)); Senate Bill 35 does not apply to mixed-use developments, and could not be so applied without violating the home rule doctrine; the project does not comply with the City's AHMF Ordinance and does not satisfy objective traffic standards; and the City did not disapprove the project under the HAA. CVL argued Senate Bill 35 does not preempt the City's discretionary zoning controls protecting its landmarks and

---

[7] CVL is not listed as a federal or state recognized tribe. (NCSL, Federal and State Recognized Tribes (updated Mar. 2020) <https://www.ncsl.org/research/state-tribal-institute/list-of-federal-and-state-recognized-tribes.aspx#federal> [as of Apr. 20, 2021].) In requesting intervention, CVL stated that Confederated Villages of Lisjan is a traditional Native American tribe with over 85 members, and Confederated Villages of Lisjan, Inc. is a California nonprofit mutual benefit corporation formed in 2017 to " 'protect and promote the rights of Ohlone people of the East Bay Area, including education, health, cultural and religious rights.' "

13

the City's determination that the project might require demolition of a historic structure that has been placed on a historic register was supported by substantial evidence.

After a hearing in September 2019, the court filed its order denying the petition on October 21, 2019.  The court denied the petition for two reasons: The City's determination that the project would require demolition of a historic structure was not "entirely without evidentiary support," and section 65913.4 does not apply to mixed-use developments.  The trial court did not reach the other grounds respondents[8] raised in support of the denial of ministerial approval.

Appellants filed a motion for reconsideration or new trial, arguing that recent amendments to section 65913.4 demonstrated the trial court should have reviewed the City's conclusion that the project would destroy a historical structure for substantial evidence rather than applying a more deferential standard of review, and also demonstrated the statute applies to mixed-use developments.  The trial court denied the motion.  Judgment was entered on December 19, 2019.

This appeal followed.

## DISCUSSION

Section 65913.4 is one of a number of measures the California Legislature has adopted to address the crisis of insufficient housing in the state.  Declarations of the statewide importance of housing in general, and affordable housing in particular, have appeared in legislation for decades.  (E.g., §§ 65580, subd. (a), as enacted in 1980, Stats. 1980, ch. 1143, p. 3697, see Stats 1999, ch. 967; 65913 ["there exists a severe shortage of affordable

___

[8] We refer to the City and Planning Department collectively as respondents.  We refer to intervener CVL separately.

housing, especially for persons and families of low and moderate income" and "there is an immediate need to encourage the development of new housing"].)

Some 30 years ago, the Legislature amended the HAA to include a number of findings regarding affordable housing, including that the "lack of affordable housing is a critical problem which threatens the economic, environmental, and social quality of life in California" (§ 65589.5, subd. (a)(1)), the "excessive cost of the state's housing supply is partially caused by activities and policies of many local governments that limit the approval of affordable housing, increase the cost of land for affordable housing, and require that high fees and exactions be paid by producers of potentially affordable housing" (§ 65589.5, subd. (a)(2)), "among the consequences of those actions are discrimination against low-income and minority households, lack of housing to support employment growth, imbalance in jobs and housing, reduced mobility, urban sprawl, excessive commuting, and air quality deterioration" (§ 65589.5, subd. (a)(3)), and "[m]any local governments do not give adequate attention to the economic, environmental, and social costs of decisions that result in disapproval of housing development projects, reduction in density of housing projects, and excessive standards for housing development projects" (§ 65589.5, subds. (a)(1)–(a)(4), added by Stats. 1990, ch. 1439, § 1).[9] Among other things, the Legislature prohibited a local government from disapproving housing development projects affordable to low and moderate-income households unless it found one of a number of enumerated conditions by substantial evidence. (§ 65589.5, subd. (d).) The Legislature stated, "This section shall be applicable to charter cities, because

_____

[9] After subsequent amendments, these provisions appear in the current statute as section 65589.5, subdivision (a)(1)(A) through (a)(1)(D).

15

the Legislature finds that the lack of affordable housing . . . is a critical statewide problem."  (§ 65589.5, subd. (g).)

The Legislature added a number of additional findings in 2017, effective January 1, 2018.  (Stats. 2017, ch. 368, § 1.5; Stats. 2017, ch. 373, § 1.5; Stats. 2017, ch. 378, § 1.5.)  These include:

"California has a housing supply and affordability crisis of historic proportions.  The consequences of failing to effectively and aggressively confront this crisis are hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives."  (§ 65589.5, subd. (a)(2)(A).)

"While the causes of this crisis are multiple and complex, the absence of meaningful and effective policy reforms to significantly enhance the approval and supply of housing affordable to Californians of all income levels is a key factor."  (§ 65589.5, subd. (a)(2)(B).)

"California's housing picture has reached a crisis of historic proportions despite the fact that, for decades, the Legislature has enacted numerous statutes intended to significantly increase the approval, development, and affordability of housing for all income levels, including this section."
(§ 65589.5, subd. (a)(2)(J).)

"The Legislature's intent in enacting this section in 1982 and in expanding its provisions since then was to significantly increase the approval and construction of new housing for all economic segments of California's communities by meaningfully and effectively curbing the capability of local governments to deny, reduce the density for, or render infeasible housing

16

development projects and emergency shelters. That intent has not been fulfilled." (§ 65589.5, subd. (a)(2)(K).)

Section 65589.5, subdivision (a)(2)(L), states, "It is the policy of the state that this section be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, housing."

Senate Bill 35, enacting section 65913.4, was filed with the Secretary of State on the same day as the bill amending section 65589.5 as just described. As with section 65589.5, the Legislature stated that the changes made by Senate Bill 35 would apply to charter cities because "ensuring access to affordable housing is a matter of statewide concern, and not a municipal affair." (Stats. 2017, ch. 366, §§ 3 [subd. (h)(4)][10] and 4, eff. Jan. 1, 2018.) Like section 65589.5, section 65913.4 contains a provision declaring the state policy "that this section be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, increased housing supply." (§ 65913.4, subd. (n).) Senate Bill 35 added "[s]treamlining housing approvals during a housing shortage" to a list of "reforms and incentives" the Legislature has provided "to facilitate and expedite the construction of affordable housing." (§ 65582.1, subd. (p); Stats. 2017, ch. 366, § 2, eff. Jan. 1, 2018.)

Our interpretation of section 65913.4 is necessarily guided by these Legislative pronouncements, as our primary task is to effectuate the Legislature's intent.

---

[10] Senate Bill 35 defined "locality" and "local government" as meaning "a city, including a charter city, a county, including a charter county, or a city and county, including a charter city and county." (§ 65913.4, former subd. (h)(4), now subd. (k)(6).)

**I.**

**A.**

In denying the petition under section 65913.4, subdivision (a)(7)(C), the trial court applied the deferential standard of review applicable under Code of Civil Procedure section 1085,[11] commenting that the City's determination the project "would require the demolition of a historic structure" was "strongly contradicted by the results of [appellants'] 2014 archeological research" but holding it was "not entirely without evidentiary support."  The court noted that Pastron's 2000 study of the site determined that "remnants in the 6-to-8 foot layer of one sample, labeled Boring 19, 'probably represents a remnant of [the Berkeley Shellmound,]' " and a "1949 survey, based on an earlier 1907 survey, placed the Berkeley Shellmound on the site.' "  The court held it was "not unreasonable for the City to determine that a pre-contact shell midden such as the Berkeley Shellmound is an immovable work built up by human artifice, and that it falls within the meaning of the term 'structure' " and "[i]n the context of the buried or ruined remnants of an historic structure, the plain meaning of the term 'demolish' includes destructive excavation that would destroy the historical or archeological integrity of the remnants of the structure."  Since the City's determinations that remnants of the Shellmound existed on the site and that the project

---

[11] Trial court reviewed the City's decision pursuant to Code of Civil Procedure section 1085 rather than Code of Civil Procedure section 1094.5 because the decision whether to grant a permit under Senate Bill 35 is a "ministerial decision that does not require an evidentiary hearing."  Code of Civil Procedure section 1094.5 applies where the administrative decision was made "as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer."  (Code Civ. Proc., § 1094.5, subd. (a).)

18

would require destructive excavation at least 10 feet underground (as indicated on diagrams for underground parking 11 feet below ground level) were not "entirely lacking in evidentiary support," the court concluded the City did not abuse its discretion in determining the project would require demolition of a historical structure.

The standard of review for traditional mandamus (Code Civ. Proc., § 1085), calls for the court to determine whether "the agency's decision was arbitrary, capricious or entirely lacking in evidentiary support, contrary to established public policy, unlawful or procedurally unfair." (*California Public Records Research, Inc. v. County of Alameda* (2019) 37 Cal.App.5th 800, 806.) Under this deferential standard of review, the court's role is to "ensure that the administrative agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choices made, and the purposes of the enabling statute." (*Golden Drugs Co., Inc. v. Maxwell-Jolly* (2009) 179 Cal.App.4th 1455, 1471; *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 586.) The appellate court applies the same standard of review as the trial court, reviewing the agency's action de novo. (*American Board of Cosmetic Surgery v. Medical Board of California* (2008) 162 Cal.App.4th 534, 547–548; *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1393.)

Arguing that the trial court erred in deferring to the City's factual determination that the project would require " 'demolition of a historic structure' " (§ 65913.4, subd. (a)(7)(C)), appellants first contend section 65913.4 requires the reviewing court to determine whether substantial evidence supported *the applicant's* position (not the City's). This argument is based upon a 2019 amendment, Assembly Bill No. 1485 (Assembly Bill 1485) (Stats. 2019, ch. 663, § 1), appellants describe as establishing a " 'substantial

19

evidence' standard *in favor of [appellants]*." Although this amendment did not become effective until after the City's and trial court's decisions, appellants argue it should apply because it only clarified rather than changed the law. Further, they argue it should govern our review, because it became effective before we rendered our decision in this case.

Entirely apart from reliance upon the statutory amendment, appellants argue the deferential standard of review applied by the trial court is inappropriate here because it effectively nullifies the legislative intent in section 65913.4 by insulating from review the fact-finding underlying an agency's determination whether its ministerial duty to approve a project is triggered. We find this argument compelling and for that reason find it unnecessary to determine whether the 2019 amendment applies retroactively.[12]

The California Supreme Court has stated that "the discretion granted an agency by the legislation authorizing its duties, and hence the appropriate standard of review, may vary depending on the language and intent of that legislation." (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 669 (*San Francisco Fire Fighters*).) The

---

[12] Assembly Bill 1485 added former subdivision (b)(3) (now subd. (c)(3)) to section 65913.4: "For purposes of this section, a development is consistent with the objective planning standards specified in subdivision (a) if there is substantial evidence that would allow a reasonable person to conclude that the development is consistent with the objective planning standards." (Stats. 2019, ch. 663, § 1, eff. Jan. 1, 2020.) The parties dispute whether this amendment changed the law—which, in respondents' view, would otherwise require the highly deferential review generally applicable under Code of Civil Procedure section 1085. If it merely clarified existing law, as appellants maintain, it would present no retroactivity issue. (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 471–472 (*McClung*), quoting *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 (*Western Security Bank*).)

court in *San Francisco Fire Fighters* was reviewing the city's determination that its charter did not require submission to arbitration of a dispute over a rule changing promotion procedures. The charter required binding arbitration of disputes between the city and unions representing firefighters, but stated an exception for " 'any rule, policy, procedure, order or practice . . . which is necessary to ensure compliance with federal, state or local anti-discrimination laws, ordinances or regulations.' " (*Ibid.*) The court explained, "If it can be discerned that the Charter gives the City very little discretion to determine what is necessary to ensure compliance, then some kind of more rigorous independent review would be required in order to prevent the City from circumventing what was intended to be a strict limitation on its authority. In other words, the Charter provision may define the scope of the City's discretion, and this in turn shapes not only *what* is to be reviewed but *how* it should be reviewed: legislation with a narrow definition of necessity would not be served by a deferential standard of review. But if it can be inferred from the authorizing legislation that a municipality has been granted considerable discretion to determine what is necessary to accomplish a valid legislative goal, a more deferential standard of review is appropriate." (*Id.* at pp. 669–670.)

Section 65913.4 expressly limits local governments' authority over applications for development of affordable housing projects meeting the specified criteria: Applications under section 65913.4 are for a "streamlined, *ministerial* approval process" based on "objective planning standards." (§ 65913.4, subd (a).) " 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.'

21

[Citation.]" (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916.) "Objective" means "[o]f, relating to, or based on externally verifiable phenomena, as opposed to an individual's perceptions, feelings, or intentions" (Black's Law Dictionary (11th ed. 2019)), "based only on facts and not influenced by personal feelings or beliefs." (Macmillan Dict. Online (2021) <https://www.macmillandictionary.com/us/dictionary/american/objective> [as of Apr. 20, 2021.) The Legislature's choice of language makes obvious its intent to constrain local governments' discretion.[13]

Respondents point to *Soderling v. City of Santa Monica* (1983) 142 Cal.App.3d 501 (*Soderling*) as confirming that a reviewing court must defer to the agency's underlying factual determinations even in a ministerial duty case. In *Soderling,* the city's planning commission had approved tentative subdivision maps for condominium conversion projects subject to specified conditions; when the petitioner requested approval of final maps, some of the conditions, including installation of smoke detectors, had not been completed. (*Id.* at pp. 503–504.) Rejecting the petitioner's argument that denying approval was a breach of the city's mandatory duty under the Subdivision Map Act (§ 66410 et seq.), *Soderling* stated, "the city council retained discretion only to determine whether there had been substantial compliance with the conditions; thereafter, performance of its mandatory statutory duty required disapproval of petitioner's final maps." (*Soderling,* at p. 509.)

---

[13] Section 65913.4, subdivision (a)(5), defines "objective zoning standards" and "objective design review standards" as "standards that involve no personal or subjective judgment by a public official and are uniformly verifiable by reference to an external and uniform benchmark or criterion available and knowable by both the development applicant or proponent and the public official prior to submittal."

Respondents characterize this quotation from *Soderling* as "describ[ing] the deference due to the agency's factual determinations as a matter of agency discretion." In fact, there was no disputed factual question in *Soderling*, as the petitioner admitted not having complied with the conditions. But, in any event, the situation in *Soderling* differs significantly from the present case. The question there was whether the petitioner had complied with conditions imposed by the local agency pursuant to its discretion under the Subdivision Map Act, which the court noted "implicitly recognizes the breadth of local powers with respect to regulation of 'the design and location of buildings in such a [condominium] project by or pursuant to local ordinances.' " (*Soderling, supra,* 142 Cal.App.3d at p. 507.) Deference to the city's factual determinations in that context would be consistent with the reasoning of *San Francisco Fire Fighters, supra,* 38 Cal.4th at page 669, as the governing statute gave the city broad discretion to determine appropriate conditions for approval of a subdivision map. In the present case, the City was *not* given discretion to impose conditions and then determine whether they were satisfied: It was *required* to approve the development project if the conditions specified by the *Legislature* were met.

The specific issue here—whether the development project "would require the demolition of a historic structure that was placed on a national, state, or local historic register"—has both a legal and a factual component. Whether the Shellmound is a "structure" within the meaning of section 65913.4, subdivision (a)(7)(C), is a question of statutory interpretation, a legal issue we review de novo. (*California Advocates for Nursing Home Reform v. Smith* (2019) 38 Cal.App.5th 838, 864.) Whether the Shellmound exists on the project site is a question of fact. For the reasons stated above, we find the highly deferential standard of review applied by the trial court

23

inappropriate here. It is unnecessary for us to further define the proper standard because, as we will discuss, we find no evidence in the record that the project "would require the demolition of a historic structure that was placed on a . . . historic register." (§ 65913.4, subd. (a)(7)(C).)

**B.**

Section 65913.4 does not define the term "structure." Dictionary definitions include "something (such as a building) that is constructed" (Merriam-Webster Dict. Online (2021) <https://www.merriam-webster.com/dictionary/structure> [as of Apr. 20, 2021]), "something that consists of parts connected together in an ordered way" and "something that has been built" (Collins English Dict. Online (2021) <https://www.collinsdictionary.com/us/dictionary/english/structure> [as of Apr. 20, 2021].) Black's Law Dictionary (11th ed. 2019) defines "structure" as "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together" and provides the illustration, "a building is a structure." Public Resources Code section 5024 (concerning inventory and list of state-owned historical resources) defines "structure," for purposes of that section and Public Resources Code section 5024.5 (notice of proposed actions affecting historical resources on master list), as "an immovable work constructed by man having interrelated parts in a definite pattern of organization and used to shelter or promote a form of human activity and which constitutes an historical resource." (Pub. Resources Code, § 5024, subd. (h).)[14]

---

[14] It is perhaps worth observing that the historical structure provision appears within a section of the statute otherwise exclusively concerned with potential demolition of *housing*:

24

Appellants maintain the Shellmound is not, and never has been, a "structure," only a "mound" or "heap" that was not "constructed with interrelated parts in a definite pattern of organization." More significantly, they argue that even if the Shellmound was at some time in the past a "structure," what currently remains are no more than remnants that cannot be viewed as a "structure" for purposes of section 65913.4.

Respondents quote the 2002 Cultural Resources Inventory's description of the Shellmound as having been "constructed continuously" between 3030 B.C. and 780 A.D. and statement that shellmounds were "repeatedly used as both residential locales and long-term repositories for the dead, and perhaps as socio-political centers." Emphasizing that the "remaining portion of a

---

"(7) The development is not located on a site where any of the following apply:

(A) The development would require the demolition of the following types of housing:

(i) Housing that is subject to a recorded covenant, ordinance, or law that restricts rents to levels affordable to persons and families of moderate, low, or very low income.

(ii) Housing that is subject to any form of rent or price control through a public entity's valid exercise of its police power.

(iii) Housing that has been occupied by tenants within the past 10 years.

(B) The site was previously used for housing that was occupied by tenants that was demolished within 10 years before the development proponent submits an application under this section.

(C) The development would require the demolition of a historic structure that was placed on a national, state, or local historic register.

(D) The property contains housing units that are occupied by tenants, and units at the property are, or were, subsequently offered for sale to the general public by the subdivider or subsequent owner of the property." (§ 65913.4, subd. (7)(A)–(D).)

cultural resource does not lose its value by virtue of the fact that a significant portion of it has been destroyed," respondents argue that the "historic structure" provision in section 65913.4 demonstrates the Legislature did not intend to "eviscerate historical preservation efforts," including protection of "relics" such as the "remainder" of the Shellmound.

Respondents urge us to construe section 65913.4, subdivision (a)(7)(C), in pari materia with historic preservation statutes. "It is a basic canon of statutory construction that statutes in pari materia should be construed together so that all parts of the statutory scheme are given effect. [Citations.] Two ' "[s]tatutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person[s] [or] things, or have the same purpose or object." ' [Citations.]" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1090–1091.)

Respondents urge that historical preservation statutes "sweep broadly in order to protect cultural resources, in whichever form the relic appears" and we should construe section 65913.4, subdivision (a)(7)(C) the same way. Their examples include title 43 of the Code of Federal Regulations section 7.3, subdivision (a)(3)(i), which includes "subsurface structures" and "middens" in the definition of "[a]rchaeological resource";[15] Health and Safety Code section 18955, which defines "qualified historical building or structure," for purposes of the State Historical Building Code, as "any structure or property, collection of structures, and their related sites deemed of importance to the history, architecture, or culture of an area by an appropriate local or state governmental jurisdiction"; and Government Code section 37361, which provides that a city "may provide for places, buildings,

---

[15] Contrary to respondents' representation, the regulation does not "defin[e] structures to include 'subsurface structures,' including 'middens.' "

structures, works of art, and other objects, having a special character or special historical or aesthetic interest or value, special conditions or regulations for their protection, enhancement, perpetuation or use . . . ."

CVL, to the same end, advocates an interpretation of the term "structure" that includes the site upon which a historical structure is or was located.  In addition to the examples provided by respondents, CVL points to a provision in the CEQA Guidelines stating that "[a]ny object, building, structure, site, area, place, record, or manuscript which a lead agency determines to be historically significant or significant in the architectural, engineering, scientific, economic, agricultural, educational, social, political, military, or cultural annals of California may be considered to be an historical resource" (Cal. Code. Regs., tit. 14, § 15064.5, subd. (a)(3)), and to the National Historic Preservation Act, which defines "historic property" to mean "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object"  (54 U.S.C. § 300308).  CVL urges that the landmark preservation provisions of the Berkeley Municipal Code refute appellants' "attempt to isolate 'structures' from their surrounding 'sites' or 'properties' " by defining "structure of merit" as including "structures, sites and areas, including single structures or sites, portions of structures, groups of structures, man-made or natural landscape elements, works of art, or integrated combinations thereof, having a special character, or special historical, architectural or aesthetic interest or value." (Berkeley Mun. Code, § 3.24.060.B.)

All these examples highlight the importance state and local government has attached to historical preservation.  But section 65913.4 is

27

not a historical preservation statute. In asking us to construe 65913.4, subdivision (a)(7)(C), in pari materia with historical preservation statutes, respondents and CVL seek to have statutes and regulations whose primary purpose is to afford protection to historical and cultural resources dictate the interpretation of a statute whose primary purpose is to expedite approval of affordable housing developments. To be sure, the historic structure exception in section 65913.4 indicates the Legislature did not intend to require ministerial approval of affordable housing projects at the expense of all historical preservation. It stated a limited exception, however, which cautions against giving that exception its broadest possible meaning.

Moreover, the provisions that respondents and CVL see as requiring a broad definition of the term "structure" in section 65913.4, subdivision (a)(7)(C), do not in fact define that term. In fact, the examples point to distinctions respondents and CVL attempt to elide, between "structure" (which may or may not be a cultural resource) and "cultural resource" (which may or may not be a structure), as well as between "structure" and "site." Respondents confuse the issue, for example, in misrepresenting the California Supreme Court as having stated that " 'historic structures' . . . include 'historical resources' that are 'historically or archaeologically significant . . . or [are] significant in the cultural annals of California.' (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 186.)" What the court actually said was the opposite—that "historical resource" may include "structures": " ' "Historical resource" includes, but is not limited to, any object, building, structure, site, area, place, record, or manuscript which is historically or archaeologically significant, or is significant in the architectural, engineering, scientific, economic, agricultural, educational,

social, political, military, or cultural annals of California.' " (*Friends of Sierra Madre,* at p. 186, quoting Pub. Resources Code, § 5020.1.)

Without question, the Shellmound is an important historical and cultural resource.  But section 65913.4, subdivision (a)(7)(C), uses the term "structure," not "resource" or "site."  The Legislature is certainly aware of the distinctions between these terms.  Indeed, recent amendments to section 65913.4 add protections for "potential tribal cultural resources" that, according to the legislative findings, were not included in Senate Bill 35 due to the Legislature's "oversight."[16]  Assembly Bill No. 831 (Assembly Bill 831), effective September 28, 2020, added to section 65913.4. provisions requiring the local government to engage in "scoping consultation" with California Native American tribes "traditionally and culturally affiliated with the geographic area," if requested by such a tribe upon notice of the intended project application.  (§ 65913.4, subd. (b); Stats. 2020, ch. 166, § 3, eff. Sept. 25, 2020; Stats. 2020, ch. 194, § 1.5, eff. Sept. 28, 2020.)  These amendments, in effect, permit a tribe to insist that a proposed project go through the standard discretionary review process, requiring compliance with CEQA and its provisions for tribal consultation (Pub. Resources Code, §§ 21080.3.1,

---

[16] Assembly Bill 831 incorporated amendments made by Assembly Bill No. 168 (Assembly Bill 168).  (Stats. 2020, ch. 194, § 2.)  The first two legislative findings in Assembly Bill 168 stated, "(a)  There was an oversight in Senate Bill 35 (Chapter 366 of the Statutes of 2017), in that it did not consider the potential destruction of tribal cultural resources, listed on registers or potential.  [¶] (b)  The Legislature desires to correct that oversight without losing any of the protections of the Assembly Bill 52 (Chapter 532 of the Statutes of 2014) process, which is contained within the California Environmental Quality Act."  (Stats. 2020, ch. 166, § 1.)

21080.3.2) that would be avoided under the ministerial approval process.[17] As amended, section 65913.4 thus protects "tribal cultural resources" potentially threatened by a proposed project differently from "a historic structure that was placed on a . . . historic register" and would be demolished by a proposed project:  The former may obtain ministerial approval if the

[17] Under section 65913.4, as amended by Assembly Bill 831, if the tribe and local government agree that "no potential tribal cultural resource would be affected by the proposed development," the application can proceed with the ministerial approval process.  (§ 65913.4, subd. (b)(2)(A).)  If the tribe and local government agree that a "potential tribal cultural resource could be affected by the proposed development" and document an enforceable agreement regarding "methods, measures, and conditions for tribal cultural resource treatment," the ministerial process can proceed and the local government must ensure the agreement is included in the requirements and conditions for the project.  (§ 65913.4, subd. (b)(2)C).)  If the parties do not document such an agreement, the application is not eligible for the ministerial process.  (*Ibid.*)

The CEQA consultation process requires the lead agency to consult with a California Native American tribe "traditionally and culturally affiliated with the geographic area of the proposed project," if requested by such a tribe upon notice of the proposed project, prior to release of a negative declaration, mitigated negative declaration or environmental impact report.  (Pub. Resources Code, § 21080.3.1, subd. (b).)  If requested by the tribe, the consultation must include alternatives to the project, recommended mitigation measures or significant effects on tribal cultural resources.  (Pub. Resources Code, § 21080.3.2, subd. (a).)  The consultation may include "discussion concerning the type of environmental review necessary, the significance of tribal cultural resources, the significance of the project's impacts on the tribal cultural resources, and, if necessary, project alternatives or the appropriate measures for preservation or mitigation that the California Native American tribe may recommended to the lead agency." (*Ibid.*)  Consultation is considered concluded when either the parties agree to measures to mitigate or avoid a significant effect on a cultural resource, if a significant effect exists, or a party, acting in good faith, determines mutual agreement cannot be reached.  (Pub. Resources Code, § 21080.3.2, subd. (b).)

30

affected tribe does not object, while the latter is ineligible for ministerial approval at all.

There is no evidence in the record that the Shellmound is now present on the project site in a state that could reasonably be viewed as an existing structure, nor even remnants recognizable as part of a structure. The strongest evidence of any intact portion of the Shellmound on the site, and the evidence to which the trial court pointed in upholding respondents' decision, is the statement from Pastron's 2000 study that material from the six- to eight-foot layer of Boring #19, in the northwest quadrant of the project site, "probably represents a remnant of CA-ALA-307." But the remnant at issue was at best a fragment of whatever structure once existed: The report described the material as "gray/black, dry, densely compacted clayey silt, containing a significant amount of mussel and clam shell fragments and little oyster shell fragments, as well as some mammal bone" and noted, "[n]o tools or other prehistoric artifacts encountered, nor were any other signs found that this is assuredly part of CA-ALA-307." In 2014, Pastron reported that "[u]pon closer examination, we determined that Boring #19 probably did not originally contain intact shellmound between 5 and 9 feet below surface level" and that the "thin layer of crushed shell" was "most likely a redistributed remnant of the West Berkeley Shellmound" and "not the intact shellmound itself."

These findings are consistent with the fact that, in designating the Shellmound as a City landmark, the City designated not a structure per se but a *site*—the three-block area in which the Shellmound was historically located, including "the site itself and all items found subsurface including artifacts from the earliest native habitation, such as but not limited to native

31

tools, ornaments, and human burials."[18]  The section 65913.4, subdivision (a)(7)(C) exception is for a "structure" placed on a historical register, not for a site where a structure once existed.

Additionally, this exception is for a project that will "require demolition of a historical structure."  There is no evidence in the record of a structure that could be demolished by appellant's project.  There may well be remnants and artifacts that could be disturbed, but that is not the issue under section 65913.4, subdivision (a)(7)(C) of the statute.  With regard to tribal cultural resources, the DEIR for the 2015 project concluded impacts on the Shellmound would be reduced to "a less-than-significant level" by the mitigation measures appellants had agreed to, and appellants confirmed in connection with the 2018 application that they intended to provide "archeological and tribal monitoring during all ground-disturbing activities" despite there being no requirement for CEQA compliance under section 65913.4.

Respondents' determination that appellants' project would require demolition of a historic structure that was placed on a historic register cannot be upheld on this record.

## C.

CVL argues that if we reverse the decision denying ministerial approval, Assembly Bill 831's tribal cultural resource protections should be applied to the project despite the fact that they were not enacted until long after appellants' application, respondents' denial and the trial court

---

[18] The Planning Department's letter to appellants explaining its analysis of the 2018 application acknowledges this point, referring to the landmarked "area" and "site."

32

proceedings.[19] Respondents disagree: The City and the Department concur with appellants that Assembly Bill 831 (and Assem. Bill 168) "are not at issue and do not affect the outcome of the appeal," as they were not in effect when the City made its decision on the development application and "[n]either AB 831 nor AB 168 include language that they were intended to apply retroactively.' "

As all the parties recognize, " '[g]enerally, statutes operate prospectively only.' " (*McClung, supra,* 34 Cal.4th at p. 475, quoting *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 840 (*Myers*).) "[A] statute that interferes with antecedent rights will not operate retroactively unless such retroactivity be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' (*United States v. Heth* (1806) 3 Cranch 399, 7 U.S. 399, 413; accord, *Myers, supra,* at p. 840.) '[A] statute may be applied retroactively only if it contains express language of retroactivity *or* if other sources provide a clear and unavoidable implication that the Legislature intended retroactive application.' (*Myers, supra,* at p. 844.)" (*McClung,* at p. 467.)

In CVL's view, the newly added statutory provisions can be applied here because they are procedural rather than substantive and, if they are

_____

[19] As earlier noted, CVL was not a recognized tribe at the outset of these proceedings. (See fn. 7, *ante*, at p. 13.) We grant CVL's request for judicial notice of a September 11, 2019, letter from the Native American Heritage Commission stating that as of August 12, 2019, CVL has met the criteria to be included on its Tribal Consultation list. CVL is now entitled to notice and an invitation to participate in a scoping consultation with regard to applications for development under section 65913.4 in a geographic area with which CVL is traditionally and culturally affiliated. (§ 65913.4, subd. (b)(1)(A)(ii); Pub. Resources Code, § 21080.3.1.) Accordingly, CVL maintains it has a right to participate in any such consultation conducted for appellants' project.

considered substantive, it is clear the Legislature intended the new provisions to apply retroactively. As to the former point, the California Supreme Court has rejected the procedural/substantive distinction CVL advances: "Some courts have thought changes categorized as merely formal or procedural present no problem of retrospective operation. . . . California has rejected this type of classification: 'In truth, the distinction relates not so much to the form of the statute as to its effects. If substantial changes are made, even in a statute which might ordinarily be classified as procedural, the operation on existing rights would be retroactive because the legal effects of past events would be changed, and the statute will be construed to operate only in futuro unless the legislative intent to the contrary clearly appears.' [Citations.]" (*Western Security Bank, supra,* 15 Cal.4th at p. 244, fn. 4.) If respondents' denial of ministerial approval for appellants' 2018 application did not comply with section 65913.4 and appellants were in fact entitled to approval under the statute at that time, it would manifestly alter "the legal effects of past events" to now require them to start the application process anew in order to provide an opportunity for tribal consultation that was not part of the statutory process when the application was submitted, processed and decided.

CVL argues that legislative intent to apply Assembly Bill 831 to all unapproved projects is demonstrated by subdivision (b)(8) of section 65913.4, which states that "[t]his subdivision shall not apply to any project that has been approved under the streamlined, ministerial approval process provided under this section before the effective date of the act adding this subdivision." According to CVL, this interpretation is necessary to avoid rendering the provision superfluous: Without it, CVL maintains, because Assembly Bill 831 is "remedial and procedural in nature," it would apply to all projects,

34

approved and unapproved, save only where such application would unconstitutionally interfere with vested rights. CVL finds further evidence of retroactive intent in the fact that the Legislature did not adopt an amendment sought by opponents of Assembly Bill 831 that would have "clarif[ied] that its provisions only apply to *applications* submitted after the bills effective date" (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 831 (2019-2020 Reg. Sess.) as amended Aug. 25, 2020, p. 9, italics added), and in references in the legislative history to the need to "continue" to protect tribal cultural resources.

CVL's view that expressly making Assembly Bill 381 *non-retroactive* for approved projects clearly demonstrates intent to make it retroactive for *all* unapproved ones ignores the difference between an application that has not yet been decided and one that has been wrongly denied. Whatever the merits of CVL's retroactivity argument with regard to ministerial approval applications pending prior to the effective date of Assembly Bill 831 (a question this appeal does not present), it makes no sense, and would be manifestly unfair, to say that a project which *should have* received ministerial approval under the law in effect at the time it was denied must begin the application process anew as a result of the local government *erroneously* denying approval.[20] If appellants' application in fact satisfied the statutory objective criteria, Berkeley's refusal to approve the application interfered with a constitutionally protected property interest which would be

_____

[20] As appellants point out, CVL threatened to sue if Berkeley approved the application under section 65913.4. Under this scenario, Assembly Bill 831 unquestionably would not have applied to the project. But, under CVL's reasoning, once the application was denied—even though erroneously—Assembly Bill 831 would require appellants to start their application process over upon successfully challenging the denial.

defeated if Assembly Bill 831 were applied retroactively.  "When a person has a legally enforceable right to receive a government benefit provided certain facts exist, this right constitutes a property interest protected by due process."  (*Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 207.)  This includes "a legitimate claim of entitlement to a permit or approval" where the agency lacks discretion to withhold its approval (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1180), as a local government does where an application satisfies the objective criteria specified in section 65913.4.

The inference CVL draws from the Legislature's failure to adopt a proposed amendment that would have made Assembly Bill 831 inapplicable to any application submitted prior to its effective date (rather than, as enacted, any previously granted approval) is contrary to the rule that the Legislature's intent for a statute to apply retroactively must be "very clear." (*Myers, supra,* 28 Cal.4th at p. 841.)  A Senate Housing Committee analysis of Assembly Bill 168 noted that the bill provided the scoping consultation process would not apply to a project that had been approved before the bill's effective date but was "not clear as to whether this process would apply to pending SB 35 applications."  (Sen. Com. on Housing, Analysis of Assem. Bill No. 168 (2019-2020 Reg. Sess.) as amended June 23, 2020, p. 10.)  The analysis stated, "The committee may wish to consider asking the author to amend the bill on the Senate Floor to clarify that Assembly Bill 168 shall apply to any pre-applications submitted to a local government as of the effective date of the bill."  (*Ibid.*)  Despite being so informed that the bill was not clear as to retroactive application to pending development applications, the Legislature did not alter the provision stating the new provisions were not applicable to approved applications.  " '[A] statute that is ambiguous with

36

respect to retroactive application is construed . . . to be unambiguously prospective. [Citations.]" (*Myers, supra,* 28 Cal.4th at p. 841.)

CVL's reliance on comments in the legislative history advancing the need to "continue" protections for tribal cultural resources is not persuasive. Even CVL does not contend Assembly Bill 831 clarified existing law. The Legislature obviously saw a need to make projects threatening tribal cultural resources ineligible for ministerial approval and, with Assembly Bill 831, intended to correct its failure to include such provisions in Senate Bill 35. Statements such as "it is important that we continue to honor the consultation process with Native American tribes and protect tribal cultural resources" (Sen. Rules Com., Analysis of Assem. Bill No. 168, 3d Reading (1019-2020 Reg. Sess.) as amended Aug. 25, 2020, pp. 8–9) and that the author would work with stakeholders to craft language "to ensure that tribal cultural resources continue to be protected" (Sen. Com. on Environ. Quality, Analysis of Assem. Bill No. 168 (2019-2020 Reg. Sess.) as amended July 1, 2019, p. 7) simply underscore the fact that the protections sought to be added to section 65913.4 existed prior to the enactment of Senate Bill 35 for standard, discretionary development projects. For example, one of the comments CVL quotes goes on to urge "restoring the right of tribal governments to engage the development process under SB 35." (Sen. Rules Com., Analysis of Assem. Bill No. 168, 3d Reading (2019-2020 Reg. Sess.) as amended Aug. 25, 2020, p. 9.)

CVL also argues that denying retroactive application of Assembly Bill 831 requires attributing to the Legislature an intent to "deprive California tribes of the consultation procedures provided in CEQA for projects submitted for SB 35 processing during the roughly three-year time period between the effective date of SB 35 on January 1, 2018, and that of AB 831" on September

37

28, 2020. We disagree. Assembly Bill 831 was intended to correct an oversight. In making its provisions inapplicable to projects previously approved under section 65913.4, the Legislature demonstrated its recognition that developers may have obtained protected interests in projects approved meanwhile. That the Legislature allowed for some projects to proceed despite not having been subjected to tribal consultation with respect to potentially threatened cultural resources does not mean the Legislature intended to "deprive" tribes of protections, only that it was also accounting for the interests of those who relied upon section 65913.4 prior to Assembly Bill 831's effective date.

## D.

Respondents argue that applying section 65913.4 in the present case would impermissibly interfere with the City's "home rule" authority over historic preservation.

"Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555 (*State Building & Construction*).) To determine whether a matter comes within a charter city's home rule authority, we must determine four issues: "whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair' "; whether there is " 'an actual conflict between [local and state law]' "; "whether the state law addresses a matter of 'statewide concern' "; and "whether the law is 'reasonably related to . . . resolution' of that concern" and " 'narrowly tailored' to avoid unnecessary interference in local governance." (*Id.* at p. 556, quoting *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 16–17, 24 (*California Fed.*

38

*Savings*).) " 'If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.' " (*State Building & Construction,* at p. 556, quoting *California Fed. Savings,* at p. 17.)

The first three parts of the "home rule" test are not really in dispute. First, respondents argue that protection of local landmarks is a classic municipal affair akin to zoning, which is recognized to be a local matter. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 774 [adoption and amendment of general plan is local, not statewide, concern]; *Center for Community Action & Environmental Justice v. City of Moreno Valley* (2018) 26 Cal.App.5th 689, 704–705 [acknowledging "municipal nature" of planning and zoning laws].) Section 37361, subdivision (b), authorizes cities to "provide for places, buildings, structures, works of art, and other objects, having a special character or special historical or aesthetic interest or value, special conditions or regulations for their protection, enhancement, perpetuation or use . . . . " Appellants do not suggest local historical preservation is not a municipal concern.

Second, there is an actual conflict between section 65913.4, subdivision (a)(7)(C), and the City's Landmark Preservation Ordinance. The City's municipal code authorizes the Commission to designate "structures, sites and areas . . . having a special character, or special historical, architectural or aesthetic interest or value" as a landmark or historic district (Berkeley Mun.

39

Code, § 3.24.060.A)[21] and requires approval by the Commission for "any construction, alteration, or demolition for which a City permit is required" in a "designated landmark, in a designated historic district or structure of merit . . . ." (Berkeley Mun. Code, § 3.24.200.) Approval "may be granted only upon determination that the proposal conforms to" specified criteria, which include that the proposed work will not "adversely affect the special character or special historical, architectural or aesthetic interest or value of the landmark and its site, as viewed both in themselves and in their setting." (Berkeley Mun. Code, § 3.24.260.C.1.a.) Government Code section 65913.4, subdivision (a)(7)(C), conflicts with these provisions, as the statute would allow construction in a designated landmark without requiring approval by the Commission if the statutory criteria are satisfied. Respondents make no argument to the contrary.[22]

Third, section 65913.4 patently addresses a matter of statewide concern. As earlier described, the Legislature has repeatedly emphasized in express findings and declarations that the lack of affordable housing in the

---

[21] The code defines the Commission's authority as extending to "structures, sites and areas, including single structures or sites, portions of structures, groups of structures, man-made or natural landscape elements, works of art, or integrated combinations thereof, having a special character, or special historical, architectural, or aesthetic interest or value." (Berkeley Mun. Code, § 3.24.060.A.) It defines "structure of merit" in the same terms: "For the purposes of this chapter, structure of merit includes structures, sites and areas, including single structures or sites, portions of structures, groups of structures, man-made or natural landscape elements, works of art, or integrated combinations thereof, having a special character, or special historical, architectural or aesthetic interest or value." (Berkeley Mun. Code, § 3.24.060.B.)

[22] Respondents argue only that section 65913.4 *as interpreted by the trial court* does not conflict with the City's historical preservation authority, because the trial court found section 65913.4 did not apply.

state is a crisis and that legislation including section 65913.4 and the HAA is intended to address that crisis by encouraging and facilitating the construction of housing in general and affordable housing in particular. Although legislative declarations of intent to preempt local law are not determinative (*DeVita v. County of Napa, supra*, 9 Cal.4th at p. 783), courts "accord 'great weight' to the Legislature's evaluation" of what constitutes a matter of statewide concern (*Baggett v. Gates* (1982) 32 Cal.3d 128, 136) and " 'defer to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution.' " (*City of El Centro v. Lanier* (2016) 245 Cal.App.4th 1494, 1503, quoting *California Fed. Savings, supra,* 54 Cal.3d at p. 24.)

As observed by the court in *Anderson v. City of San Jose* (2019) 42 Cal.App.5th 683, 709–710, judicial decisions have long "recognized the statewide dimension of the affordable housing shortage in relation to various impositions by the state into the realm of local affairs. (See *Green v. Superior Court* (1974) 10 Cal.3d 616, 625, [citing 'enormous transformation in the contemporary housing market, creating a scarcity of adequate low cost housing in virtually every urban setting']; *Buena Vista* [(1985)]175 Cal.App.3d [289,] 306, [finding 'need to provide adequate housing' is a statewide concern and rejecting home rule challenge to state provision that mandated charter city to include certain actionable components in its 'housing element']; *Bruce v. City of Alameda* (1985) 166 Cal.App.3d 18, 22 ['locally unrestricted development of low cost housing is a matter of vital state concern']; *Coalition Advocating Legal Housing Options v. City of Santa Monica* (2001) 88 Cal.App.4th 451, 458 (*City of Santa Monica*) [noting the Legislature and courts have declared housing to be a matter of statewide concern].)"

41

The statewide nature of the issue is reflected in the manner by which the Legislature has attempted to address it. Under the Housing Element Law, the state's existing and projected housing need is determined by the California Department of Housing and Community Development on a regional basis (§ 65584.01); regional councils of governments allocate the need to individual localities (§ 65584.05); and each locality must develop a plan of action (the housing element) for meeting its share of the regional housing need, including rezoning if necessary. (§§ 65583, subd. (c), 65583.2, 65584.05, 65588.) Section 65913.4 applies only if a city fails to meet its RHNA goals. (§ 65913.4, subd. (a)(4).)

Section 65913.4 addresses the crisis level statewide lack of affordable housing by eliminating local discretion to deny approval where specified objective planning criteria are met, consistent with the legislative statement of intent, in the contemporaneous amendments to the HAA, to "significantly increase the approval and construction of new housing for all economic segments of California's communities by meaningfully and effectively curbing the capability of local governments to deny, reduce the density for, or render infeasible housing development projects and emergency shelters," which intent had "not been fulfilled" despite prior versions of the HAA. (§ 65589.5, subd. (a)(2)(K).) It is difficult to think of any way the subject and purpose of this statute could be seen as anything other than a matter of statewide concern.

Respondents do not dispute this. They argue, however, that this statewide interest in increasing the amount and availability of affordable housing does not "automatically translate into a statewide interest in eliminating local landmark preservation authority" and the Legislature "has not expressed any interest in overriding charter cities' historic preservation

42

authority." This framing of the issue is inapposite: The question is whether the purpose of the ministerial approval statute is a matter of statewide concern, not whether there is a statewide interest in a specific impact it has on a municipal function. That is, the constitutionality of section 65913.4 does not turn on there being a statewide interest in limiting local historical preservation authority but rather on whether the statewide interest in increasing affordable housing sufficiently justifies the legislation's impact on that authority.

Respondents cite *Fielder v. City of Los Angeles* (1993) 14 Cal.App.4th 137 as an example of a statewide interest that "did not translate" to a statewide interest in overriding municipal authority. *Fielder* held that state legislation prohibiting local governments from imposing real estate transfer taxes did not prevent a city from imposing such a tax. The court recognized that due to "escalating ad valorem property tax rates and inflationary increases in assessed valuation," "easing the burden of property taxation" had been a matter of legislative concern for many years. A citywide transfer tax, however, would have no impact on "remediation of the recognized evils which undergird the state's interest in controlling ad valorem real property taxation" because it was a one-time burden on the "privilege of disposing of one's property and realizing its actual . . . value" that did not "upset the delicate balance of a vulnerable group of citizens in the manner that local variations in the ad valorem property tax rate or assessment practices would." (*Id.* at p. 145.) Applying the principle that " ' "the sweep of the state's protective measures may be no broader than its interest" ' " (*id.* at p. 146, quoting *California Fed. Savings, supra,* 54 Cal.3d at p. 25), *Fielder* concluded that the transfer tax was "purely local in its effects" and not a matter of statewide concern, and the statute's "substantial interference in

43

[the city's] ability to levy an excise tax far exceed[ed] the state's interest in regulating ad valorem property taxes." (*Fielder*, at p. 146.)

The present case does not involve any such mismatch between the state interest purportedly justifying interference with local authority and the subject of municipal authority with which the statute interfered. Here, the City's ability to exercise discretion over development on a City landmarked site directly interferes with the purpose of section 65913.4 to the extent an affordable housing project on this site would otherwise meet the criteria for ministerial approval. The relevant question is whether the statute is reasonably related to resolving the statewide interest it addresses and does not unduly interfere with the City's historical preservation authority. (*State Building & Construction, supra,* 54 Cal.4th at p. 556.)

There is clearly a "direct, substantial connection" between section 65913.4 and the Legislature's purpose of expediting and increasing approvals of affordable housing developments. The ministerial approval statute was intended to decrease delays and local resistance to such developments, and does so by removing local governments' discretion to deny applications for affordable housing developments meeting specified *objective* criteria. Its interference with local governance is narrowed, first, by the fact that it applies only if the city has failed to meet its RHNA obligations. (§ 65913.4, subd. (a)(4).) The many detailed requirements for application of the statute further demonstrate its relatively narrow scope.[23]

---

[23] In brief, the development site must be in a highly urbanized area (§ 65913.4, subd. (a)(2)(A) & (B)) and must not be in a number of specified locations, including a coastal zone, specified farmland, or land subject to agricultural protection or preservation, wetlands, designated high fire hazard zone, designated hazardous waste site, earthquake fault zone, special flood hazard area, regulatory floodway, land subject to a natural resource

Respondents' position, in essence, is that the Legislature has overreached because its interest in increasing affordable housing can be accomplished without interfering with local authority over historical preservation. But historical preservation is precisely the kind of subjective discretionary land use decision the Legislature sought to prevent local government from using to defeat affordable housing development. The Legislature long ago called attention to the role of local governments in contributing to the "excessive cost of the state's housing supply" with "activities and policies . . . which limit the approval of affordable housing . . . ." (§ 65589.5, former subd. (a)(2), now subd. (a)(1)(B)), added by Stats. 1990, ch. 1439, § 1.) In 2017, the Legislature expressed obvious frustration in its findings that "California's housing picture has reached a crisis of historic proportions despite the fact that, for decades, the Legislature has enacted numerous statutes intended to significantly increase the approval, development, and affordability of housing for all income levels, including this section" (§ 65589.5, subd. (a)(2)(J)) and that "the Legislature's intent in enacting [section 65589.5] in 1982 and in expanding its provisions since then was to significantly increase the approval and construction of new

protection plan, habitat for protected species, or land under a conservation easement (§ 65913.4, subd. (a)(6)) or subject to specified laws governing mobile home and recreational vehicle occupancy (§ 65913.4, subds. (a)(10)); the development must not require demolition of specified housing or of a historical structure that was placed on a historic register (§ 65913.4, subd. (a)(7)), must be consistent with existing objective zoning, subdivision and design review standards (§ 65913.4, subd. (a)(5), (a)(9)), must include specified percentages of affordable housing, which must remain at affordable levels for a set duration (45 years for owned units, 55 years for rental units) (§ 65913.4, subds. (a)(3)(A), (a)(4)(B)), and must comply with specified requirements for payment of at least the prevailing wage for the geographic area and use of a skilled and trained workforce for construction (§ 65913.4, subds. (a)(8), (a)(9)).

45

housing for all economic segments of California's communities by meaningfully and effectively curbing the capability of local governments to deny, reduce the density for, or render infeasible housing development projects and emergency shelters. That intent has not been fulfilled." (§ 65589.5, subd. (a)(2)(K), added by Stats. 2017, ch. 378, § 1.5.)

As we have discussed, we view the legislative findings contained in section 65589.5 as relevant in construing section 65913.4, which was enacted at the same time as the 2017 amendments to section 65589.5 and deals with an aspect of the same issue. With respect to appellants' project and the City landmarked Shellmound site, in light of the Legislature's long history of attempting to address the state's housing crisis and frustration with local governments' interference with that goal, and the highly subjective nature of historical preservation, the intrusion of section 65913.4 into local authority over such preservation is not broader than necessary to achieve the purpose of the legislation.[24]

We conclude the trial court erred in denying appellants' petition pursuant to section 65913.4, subdivision (a)(7)(C).

## II.

The second basis upon which the trial court denied appellants' petition for writ of mandate was that section 65913.4 does not apply to mixed-use developments. The court noted that the only mention of commercial or mixed-use development in section 65913.4 is in subdivision (a)(2)(C), which, as enacted in 2017 and in effect throughout the proceedings below, provided:

---

[24] As the present case involves the City's historical preservation authority only with regard to the Shellmound and its site, we have no occasion to consider the validity of any intrusion section 65913.4 might make into local historical preservation authority over other historical and cultural resources.

46

"The development is located on a site that satisfies all of the following: [¶] . . . [¶] A site that is zoned for residential use or residential mixed-use development, or has a general plan designation that allows residential use or a mix of residential and nonresidential uses, with at least two-thirds of the square footage of the development designated for residential use."[25] Rejecting appellants' view that the two-thirds requirement "relates to a proposed project rather than to a site for a proposed project," the trial court read this language as "provid[ing] restrictions as to sites on which a project can be located and still be eligible for SB 35 streamlined approval," limiting streamlined approval to projects on "mixed-use sites which require minimum two-thirds residential use."[26]

---

[25] As amended by Assembly Bill 831, paragraph (2)(C) of section 65913.4, subdivision (a), now provides: "(2) *The development and the site* on which it is located satisfy all of the following: [¶] . . . [¶ (C) It is zoned for residential use or residential mixed-use development, or has a general plan designation that allows residential use or a mix of residential and nonresidential uses, *and* at least two-thirds of the square footage of the development is designated for residential use." (Stats. 2020, ch. 194, § 1.5, italics added.)

[26] The court explained its conclusion as follows: "The court reads the last phrase of the subsection as a subordinate clause that acts to modify the immediately preceding independent clause that is, it describes a general plan designation with a mixed-use provision, limiting the applicable SB 35 sites to mixed-use sites which require minimum two-thirds residential use by square feet. Another textual clue is that SB 35 applies only when the project is a 'multifamily housing development.' (Gov. Code, § 65913.4, subd. (a)(l).) The context and structure of the mixed-use zoning provision also indicate that the two-thirds proviso is part of a restriction on 'the site' rather than the development project itself. (Gov. Code, § 65913.4, subd. (a)(2) ['The development is located on a site that satisfies all of the following . . .']; c.f., e.g., § 65913.4(a)(6), (a)(7), (a)(10) [listing other requirements and restrictions on the site of the development project].) When the authors of SB 35 wanted to place limitations on the development project itself rather than its site, they

47

## A.

Appellants first contend the trial court erred in denying their writ petition on this basis because it was not one of the reasons the City provided for its denial of ministerial approval. Section 65913.4 requires that if a local government determines a proposed development "is in conflict with any of the objective planning standards specified in subdivision (a), it shall provide the development proponent written documentation of which standard or standards the development conflicts with, and an explanation for the reason or reasons the development conflicts with that standard or standards" (§ 65913.4, former subd. (b)(1), now subd. (c)(1)) and, if it fails to do so, "the development shall be deemed to satisfy the objective planning standards specified in subdivision (a)." (§ 65913.4, former subd. (b)(2), now subd. (c)(2).)

As earlier described, the Department's 90-day letter informed appellants that Senate Bill 35 did not apply to the project "to the extent it impinges on legitimate municipal affairs (preservation of a designated City landmark)" but nevertheless provided the department's analysis of each of the statutory objective standards and its determination that several components of the application were inconsistent with the criteria for streamlined approval or that further information was needed. The conflicts specified in the letter were with the statutory requirement for consistency

---

expressly described the requirement as one that the 'development satisfies' rather than one that the site satisfies. (See, e.g., § 65913.4(a)(4) ['The development satisfies both of the following' affordable housing minimums], (a)(5) ['The development . . . is consistent with objective zoning standards, objective subdivision standards, and objective design review standards . . . .' ")

48

with objective zoning and design review standards (§ 65913.4, subd. (a)(5))[27] and with the requirement that the development not require demolition of a historic structure (§ 65913.4, subd. (a)(7)(C)). Other potential conflicts were identified. The analysis of section 65913.4, subdivision (a)(2)(C), did not indicate any inconsistency.[28]

Appellants contend that because respondents failed to identify any conflict with section 65913.4, subdivision (a)(2)(C), in the 90-day letter, the project had to be deemed to comply with that standard pursuant to section 65913.4, former subdivision (b), now subdivision (c). Furthermore, appellants argue the trial court erred in upholding the denial on a basis not relied upon by respondents in denying ministerial approval. " ' "[A]n agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.' " ' (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 86, 96; see *Securities and Exchange Comm'n v. Chenery Corp.* (1947) 332 U.S. 194, 196.)" (*New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 820.)

---

[27] Regarding the zoning and design conflicts, the letter directed, "See Attachment A for additional explanation." Attachment A, entitled "Objective City of Berkeley Standards Applicable to the 1900 Fourth Street Project," sets out numerous standards from the Berkeley Municipal Code and General Plan, with the City's analysis of conflicts and potential conflicts.

[28] With respect to section 65913.4, subdivision (a)(2)(C), the letter stated: "City analysis: Zoning District CW West Berkeley Commercial District Permitted uses include mixed-use developments incorporating residential and retail or residential use and other permitted use Berkeley Municipal Code Chapter 23E64. The site is designated Avenue Commercial with a Development Node overlay in the Berkeley General Plan. The site is also designated General Commercial within the West Berkeley Plan and is subject to Urban Design and Preservation Element policies protecting culturally important sites."

Respondents assert they fully complied with their obligation under section 65913.4 to inform appellants of any conflict with objective planning standards and maintain their contention that the statute does not apply to mixed-use projects is a legal argument which was not required to be included in the June 2018 letter. This position is puzzling, as the first point made in the letter was a legal argument—that section 65913.4 did not apply to the project because the statute impinged on municipal affairs with regard to preservation of a designated City landmark. It also defies at least the spirit, if not the letter, of section 65913.4, subdivision (b)(1)), which requires local governments to carefully explain any determination that a proposed development conflicts with "any of the objective planning standards specified in subdivision (a)." (§ 65913.4, former subd. (b)(1), now subd. (c)(1).) Section 65913.4, subdivision (a)(2)(C), is one such standard. Respondents' 90-day letter gave appellants no notice that the City believed there was any conflict with respect to the mixed-use aspect of their application.

In any event, this point is ultimately inconsequential. It is clear to us that the trial court misinterpreted section 65913.4, subdivision (a)(2)(C), and that the ministerial approval statute *does* apply to mixed-use developments that meet its criteria. Regardless of whether the project should be deemed consistent with section 65913.4, subdivision (a)(2)(C), due to the Department's failure to raise any conflict with that provision in its June 2018 letter, the record confirms that under a proper reading of the statute, the project is consistent with the standard.

## B.

Respondents argue that nothing in section 65913.4 authorizes its application to mixed-use projects. They describe 65913.4 as containing project-specific, site-specific, development-specific and applicant-specific

requirements, and point out that the project-specific requirement for "a multifamily housing development that contains two or more residential units" (§ 65913.4, subd. (a)(1)) says nothing about mixed uses. The only reference to mixed-use appears in subdivision (a)(2), which at the time of the application, administrative decision and trial, began, "The development is located on a site that satisfies all of the following . . ." Consequently, in respondents' view, subdivision (a)(2)(C) must be read as requiring that the site for the proposed project be zoned for, or have a general plan designation allowing, residential use or residential mixed-use development, with the zoning or general plan designation also mandating that at least two-thirds of the square footage of *any* development be designated for residential use.

This is a strained and unreasonable reading of the statutory language that makes no sense in light of the statute's purpose. Section 65913.4 consistently uses "the development" to refer to the project that is the subject of an application for ministerial approval. (E.g., § 65913.4, subds. (a)(5) ["*The development* . . . is consistent with objective zoning standards . . ."]; (a)(6) ["*The development* is not located on a site that is any of the following . . ."], italics added.) On the other hand, the statute uses "a development" when referring to development projects generally. (E.g., § 65913.4, subds. (a) ["*A development* proponent may submit an application for *a development* that is subject to the streamlined, ministerial approval process . . ."]; (a)(5)(B) ["*A development* shall be deemed consistent with the objective zoning standards . . . if . . ."]; (b)(1) ["[i]f a local government determines that *a development* submitted pursuant to this section is in conflict with any of the objective planning standards . . . it shall provide *the development* proponent with . . ."], italics added.) Reading "the development" in subdivision (a)(2)(C) as referring to *any* development rather than the subject of a particular

51

application would be inconsistent with the otherwise clear pattern in the statutory language.

Moreover, respondents' interpretation would be inconsistent with the purpose of section 65913.4 to encourage and expedite the processing of affordable housing projects. The statute expressly directs that it be "interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, increased housing supply." (§ 65913.4, former subd. (*l*), now subd. (n).)[29] Respondents' interpretation would discourage development of affordable housing by limiting the applicability of the streamlined approval process to projects on *sites* with a minimum residential requirement for mixed-use developments even if the development itself is at least two-thirds residential. Here, respondents' interpretation would make the proposed project ineligible for ministerial approval despite it being 88 percent residential and located on a site zoned for mixed uses.

Subdivision (a)(2)(C) of section 65913.4 is far more naturally read—semantically and logically—as requiring that the site for a proposed development be zoned for, or have a general plan designation allowing, either residential or mixed-use, and that at least two-thirds of the proposed development must be residential.

This interpretation is consistent with the HAA, which defines "[h]ousing development project" as "a use consisting of . . . [¶] "[r]esidential units only" or "[m]ixed-use developments consisting of residential and nonresidential uses with at least two-thirds of the square footage designated for residential use." (§ 65589.5, subd. (h)(2).) The two-thirds residential

---

[29] Subdivision (*l*) was added to section 65913.4 as part of amendments effective January 1, 2019. (Stats. 2018, ch. 840, § 2.)

52

requirement was added to section 65589.5 (effective Jan. 1, 2018) by amendments filed with the Secretary of State on the same date as Senate Bill 35. (Stats. 2017, ch. 368, § 1.5; Stats. 2017, ch. 373, § 1.5; Stats. 2017, ch. 378, § 1.5.) As statutes in pari materia, addressing the same subject and advancing the same goal, sections 65589.5 and 65913.4 should be construed together. (*Lexin v. Superior Court, supra,* 47 Cal.4th at p. 1090.) The language used in section 65589.5 to describe the type of mixed-use development meeting the statutory definition of "housing development project"—"with at least two-thirds of the square footage designated for residential use"—is precisely that used in section 65913.4, subdivision (a)(2)(C), with reference to mixed-uses. This is a strong indication the phrase was intended as a limitation on the type of development subject to ministerial approval, not the site upon which the development is located.

Indeed, this was the interpretation adopted by the City Manager, whose explanation to the City Council of the project application and requirements of section 65913.4, stated, with respect to subdivision (a)(2)(C): "Zoning and Residential Uses. The development must be located on a legal parcel or parcels that are zoned for residential uses. At least 2/3 of the floor area of the proposed building must be dedicated to residential uses." It is also the interpretation accorded by the DHCD Guidelines, which were issued pursuant to the authority granted by section 65913.4, former subdivision (i), now subdivision (*l*).[30] Respondents argue the DHCD Guidelines are

---

[30] "The department may review, adopt, amend, and repeal guidelines to implement uniform standards or criteria that supplement or clarify the terms, references, or standards set forth in this section. Any guidelines or terms adopted pursuant to this subdivision shall not be subject to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code." (§ 65913.4, former subd. (i), now subd. (*l*).)

inapplicable to this case because they issued on November 19, 2018, subsequent to the Department's June 2018 letter, and expressly state that they apply to applications submitted on or after January 1, 2019 (DHCD Guidelines, § 101(b)).  Even if not directly applicable, however, it is worth observing that our interpretation is consistent with that of the agency charged with clarifying the terms and standards set forth in section 65913.4.  The DHCD Guidelines state that "[t]o qualify to apply for the Streamlined Ministerial Approval Process," "[a]t least two-thirds of the square footage of the development shall be designated for residential use."  (DHCD Guidelines, § 400(b).)[31]

Our interpretation is confirmed by subsequent amendments to section 65913.4.  Assembly Bill No. 101 (Assembly Bill 101), effective July 31, 2019, added a sentenced to subdivision (a)(2)(C) of section 65913.4 that can only refer to a specific proposed development:  "Additional density, floor area, and units, and any other concession, incentive, or waiver of development standards granted pursuant to the Density Bonus Law in Section 65915 shall be included in the square footage calculation."  (Stats. 2019, ch. 159, § 8.) "Density bonus" refers to an increase over the otherwise maximum allowable residential density which must be granted when the applicant for a housing development agrees to provide a certain amount of low-income (or other specified types of) housing, and is calculated for a given housing development based upon the percentage of units of the specified type in that development.

---

[31] The Guidelines further state that "[b]oth residential and non-residential components of a qualified mixed-use development are eligible for the Streamlined Ministerial Approval Process.  Additional permitting requirements pertaining to the individual business located in the commercial component (e.g. alcohol use permit or adult business permit) are subject to local government processes."  (DHCD Guidelines, § 400(b).)

(§ 65915, subds. (b)(1), (f).)  The amendment's directive regarding calculation of square footage would make no sense if the two-thirds requirement was for zoning; without a specific proposed development, there would be no density bonus and concessions to calculate.  The Legislative Counsel's Digest—which is entitled to "great weight" (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1170)—explained that existing law "authorizes a development proponent to submit an application for a housing development that is subject to a streamlined, ministerial approval process . . . if the development satisfies specified objective planning standards," one of which is that "at least 2/3 of the square footage of the development be designated for residential use," and Assembly Bill 101 "would require that the calculation to determine whether 2/3 of the square footage of the development is designated for residential use include additional density, floor area, and units, and any other concession, incentive, or waiver, granted pursuant to the Density Bonus Law."  (Legis. Counsel's Dig., Assem. Bill No. 101 (2019-2020 Reg. Sess.) par. (4).)

Similarly, the Legislative Counsel's Digest for Assembly Bill 1485 (Stats. 2019, ch. 663, § 1; Stats. 2019, ch. 844, § 5.3), which specified that calculation of the development's square footage does not include underground space, stated, "Existing law requires that at least 2/3 of the square footage of a development receiving approval pursuant to these provisions must be designated for residential use.  [¶] This bill would provide that 'square footage,' for these purposes, does not include underground space, such as basements or underground parking garages."  (Legis. Counsel's Dig., Assem. Bill No. 1485 (2019-2020 Reg. Sess.) par. (2).)

Finally, Assembly Bill 831 amended section 65913.4, subdivision (a)(2)(C), to read:  "(2)  The *development and the site on which it is located*

satisfy all of the following:  [¶] . . . [¶] (C)  It is zoned for residential use or residential mixed-use development, or has a general plan designation that allows residential use or a mix of residential and nonresidential uses, *and* at least 2/3 of the square footage of the development *is* designated for residential use."  (Italics added.)  This simple change of language removes any reasonable doubt that the 2/3 requirement applies to the development submitted for approval and not the zoning applicable to the site.

According to the bill's author, "AB 831 clarifies that the 2/3 residential requirement in SB 35 applies only to a project and not the project's site or its zoning."  (Sen. Com. on Housing, Analysis of Assem. Bill No. 831 (2019-2020 Reg. Sess.) as amended July 21, 2020, p. 4.)  In fact, this clarification appears to have been occasioned by the trial court's decision in the present case.  The committee report further explains: *"Clarifying the 2/3 requirement.*  SB 35 provides that 2/3 of a project must be residential (i.e. authorizes certain mixed-use projects) to qualify for streamlined approval.  In its guidelines, HCD interprets the language this way.  Recently in an SB 35 lawsuit, a superior court judge interpreted SB 35 streamlining to apply only to mixed-use projects in the narrow circumstance where the site's zoning calls for at least 2/3 residential.  According to the sponsors, there is likely not a zoning district in the state that would meet this requirement.  This bill clarifies the author's intent that the 2/3 residential requirement apply to the proposed project itself, not the zoning."  (Sen. Com. on Housing, Analysis of Assem. Bill No. 831 (2019-2020 Reg. Sess.) as amended July 21, 2020, p. 6.)

Respondents argue these amendments are inapplicable to the present case because they were adopted and became effective subsequent to the denial of ministerial approval.  But "a statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to

56

transactions predating its enactment." (*Western Security Bank, supra,* 14 Cal.4th at p. 243.) The 2019 amendments addressed how to calculate the square footage specified in subdivision (a)(2)(C) of section 65913.4; they did not change the underlying requirement that "at least two-thirds of the square footage of the development" be designated for residential use. The 2020 amendment made a non-substantive change in language that served only to clarify the statute in response to a court's decision. The amendments did not "change the legal effect of past actions" (*Western Security Bank,* at p. 252) and therefore can properly be applied to this case. They demonstrate unequivocally what the language of the statute, in our view, indicated all along: that the ministerial approval statute applies to mixed-use developments that designate at least two-thirds of their square footage to residential use.

Here, the application specified that the residential area of the development would occupy 88 percent of the space (254,888 gross square feet of the project's total 286,809 square feet). It thus satisfied the requirement that at least two-thirds of the total square footage be designated for residential use.

## C.

Respondents further argue that applying section 65913.4 to mixed-use developments interferes with the City's home rule authority to regulate commercial uses. The Berkeley Municipal Code requires a use permit, with public hearing, where the retail space in a mixed-use development comprises 20,000 square feet or more. (Berkeley Mun. Code, § 23E.64.030.) The 2018 application describes the proposed project as including approximately 27,500 square feet of retail space and parking. Because section 65913.4, subdivision (a), provides for a ministerial approval process under which the proposed

57

development "is not subject to a conditional use permit," respondents maintain it interferes with charter cities' traditional land use authority to determine whether particular commercial uses should be subject to appropriate conditions of approval such as security measures, hours of operations, noise restrictions, light pollution and emissions controls.

" 'Land use regulation in California has historically been a function of local government under the grant of police power contained in California Constitution, article XI, section 7.' [Citation.]" (*DeVita v. County of Napa, supra*, 9 Cal.4th at p. 782; *IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 89 ["The power of cities and counties to zone land use in accordance with local conditions is well entrenched."].) Respondents argue that the Legislature's interest in increasing the supply of affordable housing does not require it to intrude upon local authority over commercial uses, and the Legislature has not expressed any intention to preempt local authority over such uses.

The extent to which section 65913.4 interferes with local regulation of commercial uses appears to be fairly minimal, and incidental to the statute's purpose of facilitating development of affordable housing. While the overall "multifamily housing development" eligible for ministerial approval is not subject to a conditional use permit, nothing in section 65913.4 requires or allows ministerial approval of a development that includes commercial uses conflicting with local zoning. To the contrary, to be eligible for ministerial approval, the proposed development must be "consistent with objective zoning standards, objective subdivision standards, and objective design review standards" established by the locality. (§ 65913.4, subd. (a)(5).) Nothing in section 65913.4 exempts the businesses that would occupy the commercial portion of appellants' project from permit and licensing

requirements for their particular operations.  In light of the limited extent of any intrusion into municipal authority over commercial uses, and narrowly delineated circumstances in which section 65913.4 applies, we conclude the statute—which, as we have said, is reasonably related to resolving the statewide interest in alleviating delays and obstacles to development of affordable housing projects—does not unduly interfere with the City's land use authority.  (*State Building & Construction, supra,* 54 Cal.4th at p. 556.)

## III.

Respondents additionally denied ministerial approval due to asserted conflicts with "objective zoning standards, objective subdivision standards, and objective design review standards in effect at the time that the development is submitted to the local government pursuant to this section" (§ 65913.4, subd. (a)(5)).  Respondents found two such conflicts, one with the City's AHMF requirements with respect to very low-income units (§ 65913.4, subd. (a)(5)), and the other with the City's requirement that the project meet applicable performance standards for off-site impacts and not exceed the amount and intensity of use that can be served by available traffic capacity (*Ibid.*).

## A.

The stated purpose of the City's AHMF is to mitigate the impacts of new market-rate rental units on the need for affordable housing.  (Berkeley Mun Code, § 22.20.065.A.8.)  Berkeley Municipal Code section 22.20.065.C requires the AHMF, or a portion of it, to be paid if a development does not provide 20 percent of the total units at rates affordable to low and very low-

income households,[32] with 50 percent of the below market rate units affordable to very low-income households. Appellants' project includes 50 percent low-income units—considerably more than the 20 percent total below market rate units required by the municipal code. Respondents denied the project application on the ground that the proposed project failed to comply with the "objective requirements" of the AHMF ordinance in that it does not include any very low-income units, appellants claimed they were exempt from the fee requirement but had not formally requested an exemption and "the City cannot accept an application that summarily declares that the AHMF will not be paid."[33]

Appellants contend the AHMF ordinance cannot be used as a basis for denial of their application for ministerial approval because section 65913.4 requires ministerial approval for a project meeting the specified objective

---

[32] "Low-income household" is defined as household income of no more than 80 percent of the area median income (AMI) (Berkeley Mun. Code, § 22.20.065.B.4); "very low-income household" is defined as household income of no more than 50 percent of AMI (Berkeley Mun. Code, § 22.20.065.B.7).

[33] The September 2018 denial letter stated, "Municipal Code Section 22.20.065 requires that applicants for rental housing projects either pay the specified AHMF or designate a percentage of the proposed housing units as affordable to low-income ("LI") and very low-income ("VLI") households. The Project application asserts that 'the Project is exempt from the City's affordable housing mitigation fee at this time . . . by providing 50 of its units for low-income households.' . . . However, the application does not provide the requisite number of VLI units that are required by Municipal Code Section 22.20.065.C.4, nor have you undertaken any formal process to request an exemption from the AHMF. Thus, you have not established that the Project is exempt from the AHMF, and the City cannot accept an application that summarily declares that the AHMF will not be paid. The development application thus fails to comply with the objective requirements of Municipal Code Section 22.20.065, rendering SB 35 inapplicable to the Project."

planning *standards*, and a mitigation *fee* is not a *standard*. As appellants observe, the development and site characteristics and requirements described in section 65913.4 as "objective planning standards," and the statute's requirements for consistency with "objective zoning standards, objective subdivision standards, and objective design review standards," refer to objective criteria or benchmarks a given development may or may not satisfy. (See Merriam-Webster Dict. Online, *supra*, <https://www.merriam-webster.com/dictionary/standard> [as of Apr. 20, 2020] [a standard is "something set up and established by authority as a rule for the measure of quantity, weight, extent, value, or quality or point of reference"].) A mitigation fee does not establish such a criterion: It is a "monetary exaction" imposed to "defray the cost of public facilities needed to serve the growth caused by the project." (*Boatworks, LLC v. City of Alameda* (2019) 35 Cal.App.5th 290, 294.)

Respondents obscure the issue with subtle mischaracterizations of both appellants' argument and the AHMF ordinance. According to respondents, appellants "contend that the 2018 Application satisfied the Affordable Housing Mitigation Fee Ordinance," which respondents describe as requiring that at least 50 percent of affordable units be set aside for very low-income households "unless the developer opts instead to pay a mitigation fee." But appellants have never claimed to satisfy the ordinance; they maintain they are *not required* to satisfy it. And the ordinance imposes a mitigation fee on new rental housing development which the applicant "may elect to avoid" by providing the requisite amount of affordable housing. (Berkeley Mun. Code, § 22.20.065.C.2.) By reversing the direct object of the ordinance and its provision of an alternative to avoid that object, respondents are able to argue that appellants did not meet the "objective criterion" established by the

61

ordinance and, therefore, the application for ministerial approval could be denied.

The AHMF itself, as opposed to the provision of sufficient affordable housing to avoid it, is not a "standard" with which a proposed development can be inconsistent. The decision whether to pay the fee or avoid it by providing the required number and type of housing is not required at the time of application; the election may be made until the date the first building permit for the development is issued. The fee must be paid "at the issuance of a Certificate of Occupancy." (Berkeley Mun. Code, § 22.20.065.C.1.) Whether the City could grant approval under section 65913.4 and subsequently enforce Berkeley Municipal Code section 22.20.065 is a question not presented in the current posture of this case. It is sufficient for us to hold that the AHMF ordinance did not provide respondents with a valid basis for denying ministerial approval due to conflict with an objective planning standard.

Appellants argue persuasively that the statewide interest served by section 65913.4 should not be defeated where a project complies with the standards for ministerial approval set forth in the statute and a local ordinance requires a *lower* percentage of low-income housing, albeit with an included component of required units for very low-income households.[34]

_____

[34] The affordable housing percentage specified in the City's AHMF ordinance is both more and less stringent than what section 65913.4 requires: It is more stringent in requiring half of a development's low-income housing to be affordable for very low-income households, but its total affordable housing requirement—20 percent of the units in a development—is considerably less than the 50 percent low-income housing required by section 65913.4 for a locality that has not met its RHNA share. While section 65913.4 expressly provides for its requirements to give way to more stringent local ordinances in some circumstances, the situation posed by the AHMF is

Section 65913.4, as we have said, was intended to expedite processing of applications for low-income housing developments by curbing local resistance and delays. Respondents' reliance upon Berkeley Municipal Code section 22.20.065 to deny ministerial approval to a project providing 50 percent low-income housing frustrates the purpose of section 65913.4.[35]

----

not one of them. For example, section 65913.4 provides for a local ordinance to prevail over the statute's requirement that a proposed development provide at least 10 percent of its units to low-income households where the locality has not met its RHNA for above moderate-income housing if the local ordinance requires more than 10 percent low-income housing. (§ 65913.4, subd. (a)(4)(B)(i)(I).) For localities within the San Francisco Bay Area, section 65913.4 requires dedication of 20 percent of a development's units to households making "below 120 percent of the area median income with the average income of the units at or below 100 percent of the area median income," but provides for a local ordinance to apply if it "requires greater than 20 percent of the units be dedicated to housing affordable to households making at or below 120 percent of the area median income, or requires that any of the units be dedicated at a level deeper than 120 percent." (§ 65913.4, subd. (a)(4)(B)(i)(II)(ia).) Where, as here, a project's eligibility for ministerial approval is pursuant to section 65913.4, subdivision (a)(4)(B)(ii), the statute specifies that its requirement of 50 percent is superseded by a local ordinance "that requires greater than 50 percent of the units be dedicated to housing affordable to households making at or below 80 percent of the area median income"—but, unlike subdivision (a)(4)(B)(i)(II)(ia), it does not say the same for local ordinances requiring provision of housing for households at even lower income levels.

[35] The City's municipal code provides a formula for determining a proportional discount to the AHMF for projects that include low-income and very low-income units comprising less than 20 percent of the total units. Respondents found that appellants did not qualify for a discounted AHMF because the project did not include any very low-income units. Appellants argue that imposing the full AHMF fee on a project providing 50 percent affordable housing units is plainly excessive.

"When a local agency imposes any fee or exaction as a condition of approval of a proposed development, as defined by Section 65927, or development project, those fees or exactions shall not exceed the estimated

**B.**

The 90-day letter informed appellants that the project "potentially" conflicted with the "objective standards" that it "[b]e capable of meeting any applicable performance standards for off-site impacts" and "[n]ot exceed the amount and intensity of use that can be served by available traffic capacity and potential parking supply" (Berkeley Mun. Code, § 23E64.090) and stated that an updated traffic analysis was required and the City "has 'Guidelines for Development of Traffic Impact Reports' which includes methodology and the requirement to identify feasible mitigation measures and provide mitigation." The 90-day letter made no mention of any specific criterion for measuring traffic impacts, and the Guidelines for Development of Traffic Impact Reports (Traffic Guidelines) referenced in the letter are not part of the administrative record.[36] The letter thus failed to comply with the

reasonable cost of providing the service or facility for which the fee or exaction is imposed." (§ 66005, subd. (a); *Boatworks, LLC v. City of Alameda supra,* 35 Cal.App.5th at p. 294.) When the City's formula is applied to a project with a combined total of 20 percent low and very low-income units, the resulting fee is zero, reflecting the determination that this proportion of affordable housing units offsets the costs imposed by the project. The same formula suggests that the 50 percent affordable housing provided by appellants' project would have a substantial *positive* impact. While this does not account for the lack of *very low*-income housing, appellants suggest that if low-income housing is assumed to be half as mitigating as very low-income housing, in effect lowering the proportion of affordable housing in their project from 50 to 25 percent, the City's formula would still result in a positive impact. Given our conclusion that the AHMF ordinance does not establish an objective standard with which a proposed development can be found inconsistent, we find it unnecessary to resolve the excessiveness issue.

[36] Appellants responded that section 65913.4 did not require a traffic analysis but nevertheless provided a "Focused Transportation Impact Analysis," which concluded the "project trips would not cause any significant impacts at the intersections evaluated in the 2016 DEIR under Existing Plus

statutory requirement that the City provide, within 90 days of application, "written documentation of which standard or standards the development conflicts with, and an explanation for the reason or reasons the development conflicts with that standard or standards."  (§ 65913.4, former subd. (b)(1), now subd. (c)(1).)  "If the local government fails to provide the required documentation pursuant to paragraph (1), the development shall be deemed to satisfy the objective planning standards specified in subdivision (a)." (§ 65913.4, former subd. (b)(2), now subd. (c)(2).)

Respondent's September 2018 denial letter clarified that the issue was with cumulative traffic impacts.[37]  This explanation, however, came too late to allow appellants to attempt to address the asserted conflict.[38] Furthermore, its only reference to anything like an objective criterion for

---

Project conditions" and the "project would not cause a significant impact on safety or emergency access."

[37] The letter stated that even the original, smaller, 2015 project "was found to contribute to exceedances of street capacity in cumulative scenarios, in conflict of the City's Guidelines," citing the portions of the DEIR concerning traffic impacts, and that "[w]hen analyzed pursuant to the City's Guidelines for Development of Traffic Impact Reports (i.e., an 'external and uniform benchmark or criterion'), it is not clear that the Project would meet these performance standards under cumulative traffic conditions."

[38] The 90-day letter mentioned cumulative impacts only in an attachment summarizing the impacts and mitigation measures discussed in the DEIR, which include four intersections found to have significant impacts under "Cumulative Plus Project Conditions."  The DEIR's findings are not in themselves "objective standards"; they are conclusions CEQA requires to be considered in making discretionary decisions with potential environmental impacts.  In the CEQA context, even where significant impacts are determined to be unavoidable, a lead agency can still approve the project if it determines the unavoidable impacts are acceptable due to overriding economic, legal, social, technological or other benefits of the project.  (Pub. Resources Code, §§ 21002, 21081; Cal. Code Regs., tit. 14, §§ 15092, 15093.)

assessing cumulative traffic was in a footnote relating the DEIR's description of a portion of the City's Traffic Guidelines, and that description overstated the definitiveness of the criterion mentioned, omitting qualifying language that appears in the Traffic Guidelines themselves.[39]  Even on this appeal, while arguing that appellants did not demonstrate the project would satisfy objective "cumulative traffic criteria," respondents do not describe a specific criterion for assessing cumulative traffic impacts.  To the extent the criterion stated in the Traffic Guidelines can be considered an "objective zoning standard" within the meaning of section 65913.4, we are led to it only through respondents' citation to the DEIR, which in turn refers to the Traffic Guidelines—which, again, are not even part of the administrative record.

---

[39] The denial letter quotes the DEIR's statement that the traffic related findings were based on "City of Berkeley criteria, which state that an impact would occur only if the intersection meets peak hour signal warrants, operates at LOS F, and adds more than 10 vehicles to the critical approach/movement."  The Traffic Guidelines, as we have noted, are not a part of the administrative record.  As they appear through the City's website, however, the statement to which the DEIR refers appears less definitive.  The Traffic Guidelines state, with respect to unsignalized intersections:  "Unlike for signalized intersections, it is difficult to establish fixed significance thresholds for unsignalized intersections, particularly those with only side-street stop control. *In general, mitigations are required if a movement is at LOS F, the peak hour signal warrant is met, and a minimum of 10 vehicles is added to the critical movement.* Nevertheless, as delays increase dramatically once LOS F is reached, consideration should be given to the number of new trips added by a project and other factors, such as the feasibility of alternative routes and the proximity of adjacent traffic signals."  (Italics added.)  Thus, what reads as an objective standard as described in the DEIR appears to leave room for interpretation—and discretion—as actually stated in the City's guidelines.

66

In these circumstances, respondents' assertion that the project does not comply with zoning standards with regard to traffic is an insufficient basis for its denial of ministerial approval under section 65913.4.[40]

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to grant the petition for writ of mandate.

Appellants shall recover their costs on appeal.

---

[40] Our conclusion that the City's denial of appellants' application for ministerial approval failed to comply with section 65913.4 makes it unnecessary for us to address respondents' and CVL's additional contention that the City's denial violated the HAA.

 

 

 

                        _____

                        Kline, P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.

*Ruegg & Ellsworth et al. v. City of Berkeley et al.* (A159218)

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Frank Roesch |
| Attorneys for Appellants: | Reed Smith<br>Raymond A. Cardozo<br>Brian A. Sutherland<br><br>Holland & Knight<br>Jennifer L. Hernandez<br>Daniel R. Golub<br>Emily Martinez Lieban |
| Attorneys for Amicus Curiae<br>on behalf of Appellants: | Matthew Gelfand |
| Attorneys for Respondents: | Berkeley City Attorney's Office<br>Farimah F. Brown<br>City Attorney<br><br>Christopher D. Jensen<br>Associate City Attorney<br><br>Burke, Williams & Sorensen<br>Kevin D. Siegel<br>Megan A. Burke<br>Deepa Sharma |
| Attorney for Interveners and<br>Respondents: | Law Offices of Thomas N. Lippe<br>Thomas N. Lippe |
| Attorneys for Amici Curiae<br>on behalf of Respondents and<br>Interveners and Respondents: | Courtney Ann Coyle<br><br>Kaplan Kirsch & Rockwell<br>Matthew G. Adams<br>Sara A. Dutschke<br>Sharee Williamson, *Pro hac vice* |

Attorneys for Amicus Curiae     Colantuono Highsmith & Whatley
                                Michael G. Colantuono
                                Matthew T. Summers
                                Sharee Williamson, *Pro hac vice*